UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07CR484 RWS |
| | ) | |
| MICHAEL GORMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the pretrial motions on September 28, 2007. Further, the Defendant requested a transcript of the proceedings, and the transcript was filed on October 29, 2007. Further, the undersigned set a post-hearing briefing schedule directing the Government to file its brief no later than November 9, 2007, and the Defendant his brief no later than November 19, 2007. Therefore, based upon the evidence adduced at the hearing on the motion to suppress, the transcript of the hearing, as well as the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Robert Orton is a police officer with the St. Louis police department and has been so employed for approximately thirteen years. Sometime prior to August 2, 2007, he received information from an ATF agent that a confidential informant had told the agent that a convicted felon who lived on Giles Street in south St. Louis was in possession of a .38 caliber revolver at his home. The confidential informant gave the ATF agent a description of the person possessing the weapon

including his age and race, and told the agent that the person was known to him by the street name or nickname of "Trouble."

After receiving this information, Officer Orton used the REJIS law enforcement database in an attempt to determine if anyone meeting the above description used the street name of "Trouble." He determined that the Defendant Michael Gorman was a convicted felon who used the street name "Trouble," and that Gorman lived at 4075 Giles in St. Louis. He also determined that the Defendant was the same age, race, and general description as the person who the confidential informant had described as the person known to him as "Trouble."

In checking the Defendant's detailed criminal record, he determined that the Defendant had been previously convicted of felony crimes, and that there were currently arrest warrants outstanding for the Defendant from two St. Louis County municipalities. Orton further checked the status of these warrants and determined that they were active arrest warrants, and that the Defendant was actively wanted on those warrants from St. Louis County. Orton also obtained a photograph of the Defendant and decided that if he saw the Defendant while he was on patrol, he would arrest him pursuant to the warrants from the St. Louis County municipalities and attempt to determine if the Defendant was, in fact, also in possession of a firearm.

On the evening of August 2, 2007, Orton was on patrol with other officers when he observed the Defendant standing in a courtyard in front of an apartment building at 3941 South Grand Boulevard in St. Louis. Orton approached the Defendant and after positively identifying him, placed the Defendant under arrest for the two outstanding warrants. After placing the Defendant under arrest, he immediately advised the Defendant of his full <u>Miranda</u> rights by reading his rights to him from a St. Louis police department advice of rights form. After reading the Defendant his full rights,

he asked the Defendant if he understood his rights, and the Defendant stated that he understood them. After arresting the Defendant, Officer Orton and other officers processed other individuals who were unrelated to the Defendant who they were, according to Officer Orton, "dealing with." After about fifteen minutes, Orton returned to the Defendant and told him that he had information that Gorman had a .38 caliber pistol at his house on Giles. The Defendant stated that he had nothing to hide at his house on Giles from the officers. At this point, Orton asked the Defendant if he could search the house, and the Defendant stated he could search it.

The officers then transported the Defendant to his residence at 4075 Giles, which was about four blocks from the location on Grand Avenue where the Defendant was arrested. After arriving at the location, Orton and other officers handed the Defendant a written consent to search form. This form was read to him by the officers. The form first states that Gorman grants his consent to the officers to search 4075 Giles, Apt. 1-S. The form then reads as follows:

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

After reading the form and having it read to him by the officers, Gorman signed the form granting consent. Orton witnessed the form, and testified that he personally observed the Defendant sign the form. At the time the form was signed, the Defendant was seated in the rear seat of the police vehicle with his legs outside of the vehicle on the ground, and signed the form on his lap without a hard surface on which to sign the form. The form was signed "Mike Gorman" by him.

Eventually, after the consent to search was signed, the officers gained entry to the house by the Defendant knocking on the door and shouting for his girlfriend to come to the door. After some time, the Defendant's girlfriend came to the door and opened it, and the officers were allowed to

enter. They then searched the house, and within about five minutes found a .38 caliber revolver concealed in the oven. Also seized from the apartment at 4075 Giles was a digital scale along with marijuana, and a piece of mail addressed to the Defendant at 4075 Giles from the state office of probation and parole. When Officer Orton asked the Defendant about the marijuana and the gun, he stated that he did not know that the marijuana and the gun were in the apartment.

After the gun was seized, the Defendant was transported to the south patrol division where he was interviewed by Special Agent Michael Ramos of the Bureau of Alcohol, Tobacco and Firearms. Prior to interviewing the Defendant, Special Agent Ramos again advised the Defendant of his full rights using an ATF advice of rights form. Ramos read each right to the Defendant from the form, and asked the Defendant if he understood the rights. The Defendant initialed each right stating he understood it. After initialing the rights, Ramos read the waiver portion of the form to him. The waiver portion reads as follows:

> I have read the statement of my rights or it has been read to me and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Gorman signed the waiver form "Michael Gorman," and was then interviewed by Ramos. After about five minutes of conversation with Ramos, the Defendant admitted that he possessed the gun and that it was his gun that was seized from the apartment. He told Ramos that he bought the gun for $150 from a man in Pine Lawn. He also told Ramos that he was at the same person's house two days before his arrest and observed more guns at this house. He was not promised anything nor threatened in any way in return for this oral statement. As stated above, Ramos testified that the oral statement was made not more than five minutes after the Defendant was advised of his rights.

After the Defendant made his oral admission, Ramos asked him if he would reduce the oral statement to writing. The Defendant stated that he would make a written statement if he was allowed to go home that night. Ramos was aware that the municipalities involved in the Defendant's arrest warrants had told the St. Louis police department that they were too busy to come and pick up the Defendant, and that he should be released anyway. Because the Defendant was going to be released at any rate, Ramos told him that he would be able to go home that same night. Ramos then transported the Defendant back to his house, and on the way to the house, the Defendant reduced his oral statement to writing.[1]

## Conclusions of Law

### A. The Arrest of the Defendant

In the case now at bar, the undersigned concludes that the arrest of the Defendant was lawful. In the case now at bar, Officer Orton determined that there were active arrest warrants for the Defendant, and obtained a photograph of the Defendant so he could positively identify him as the person for whom the outstanding arrest warrants had been issued. The Supreme Court has stated that an officer may rely on this type of information either from a dispatcher or from another police agency

---

[1] The Defendant also implies that he did not sign the consent to search form because the form is signed "Mike Gorman" rather than "Michael Gorman," and apparently because the "Mike Gorman" signature slants to the left, while the "Michael Gorman" signatures on the advice of rights form and the signed statement slant to the right. Significantly, however, the evidence presented at the hearing was that the Defendant personally signed the consent to search form, the waiver form, and the written statement. This testimony was uncontradicted, and there was no testimony or evidence presented to the contrary. In addition, the testimony at the hearing revealed that the Defendant was sitting half in and half out of the police car, and signed the consent to search form on his lap without any other surface on which to write. Further, the undersigned notes that the writing in the body of the written statement slants to the left in some areas and to the right in other areas indicating that the Defendant possibly at various times slants his writings in both directions. Because of the above, the undersigned accepts the uncontradicted testimony of Officer Orton that the Defendant personally signed the consent to search form.

in making a lawful arrest of the defendant pursuant to a warrant issued by that agency.  See Arizona v. Evans, 514 U.S. 1 (1995); Gerstein v. Pugh, 420 U.S. 103 (1975).  Therefore, the undersigned concludes that the arrest of the Defendant on the arrest warrants from St. Louis County was valid and lawful.

B.  The Search of the Apartment

The undersigned further concludes the search of 4075 Giles, Apt. 1-S, was lawful and was based on the consent to search given by the Defendant.  Police officers may search a premises if they obtain consent to do so from someone who has adequate authority over the premises.  Consent is voluntary if it is the product of free choice and is not given under coercion or duress.  Voluntariness is a fact question to be determined from the totality of the circumstances present.  See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974).  Among the factors to be considered in determining whether consent is voluntarily include the following: whether or not the defendant was aware that he may refuse to consent; the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by police; whether the defendant relied on promises or representations made by the police; whether the consent occurred in public or in a secluded location; and, whether the defendant objected to the search or passively looked on.  See United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990).

Applying the above law to the present case, the undersigned concludes that there is little question that the consent was voluntarily given.  The Defendant was not threatened, coerced, or intimidated by the police; the police made no promises to the Defendant to obtain his consent; consent was given first in front of a public apartment and then written consent while the Defendant was seated in front of his house in a police car; the Defendant did not object to any aspect of the search; the

Defendant was aware that he could refuse to consent to the search, and the Defendant had been

detained for only about fifteen minutes before he initially consented to the search. Therefore, based

on the above, the undersigned concludes that the Defendant voluntarily consented to all aspects of

the search at his premises.[2]

### C. Statements Made by the Defendant to Officer Orton and Special Agent Ramos

Based on the above findings, the undersigned concludes that the Defendant's statements both

to Officer Orton and Special Agent Ramos were voluntarily made after he had been advised of his

full Miranda rights, stated he understood those rights, and waived his rights.

Regarding statements made under circumstances such as exist in the present case, the Eighth

Circuit Court of Appeals has stated:

> The appropriate test for determining the voluntariness of a confession is "whether in the light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will."

United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990).

The Eighth Circuit has likewise held that a police officer's statement "it's in your best interest

to cooperate" did not vitiate the voluntariness of a confession. See Rachlin v. United States, 723

F.2d 1373 (8th Cir. 1983). Further, as stated in United States v. Kilgore, 58 F.3d 350, 352 (8th Cir.

1995):

---

[2] The Defendant also states that the scope of his consent did not include a consent to search the oven and broiler section of the stove. The Defendant told the officers he had nothing to hide in his apartment and signed a general consent to search "4075 Giles, Apt. 1S." No limitation was placed on the scope of the search, and the Defendant understood that the officers were searching for a handgun or other contraband. Therefore, the undersigned concludes that a search of the broiler section of the stove was well within the scope of the consent to search. See Florida v. Jimeno, 500 U.S. 248 (1991).

7

The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's " 'will [was] overborne and his capacity for self-determination impaired.' ". . .In making this determination, courts will inquire into the totality of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist any pressure.

Further, the fact that a defendant was fully advised of his rights and waived his rights weighs heavily in favor of voluntariness. In <u>Evans v. Dowd</u>, 932 F.2d 739 (8th Cir. 1971), police officers falsely told the defendant that they had an eyewitness of him committing a crime. Yet, the Court upheld the voluntariness of the confession as follows:

Here, the warnings were part of the totality of the circumstances and, thus, it would be difficult to conclude that the police coerced the confession while at the same time warning Evans that he need not say anything.

<u>Evans v. Dowd</u> at 742.

Further, stating that a defendant may receive a long prison sentence if he did not cooperate has been held not, in and of itself, to vitiate the voluntariness of a confession. <u>See</u> <u>United States v. Meirovitz</u>, <u>supra</u>. It has also been held that a statement is not rendered involuntary merely because the defendant is told that he or she will receive a lesser sentence or more lenient treatment if he or she cooperates. <u>See</u> <u>United States v. Alvarado</u>, 882 F.2d 645 (2nd Cir. 1989). <u>See also</u>, <u>United States v. Leon-Guerrero</u>, 847 F.2d 1363 (9th Cir. 1988).

In <u>United States v. Kilgore</u>, a case factually similar to the one at bar, the defendant claimed that his confession was involuntary because he was told that he would not go to jail that evening and would not be arrested that evening. In holding that this statement did not overbear the defendant's will and the confession was voluntarily made, the Court stated as follows:

. . .The record indicates instead that Kilgore received a promise that he would not go to jail that evening, not that he would not have to go to jail at some time in the future. Moreover, even if Kilgore was confused and confessed to the crime on the mistaken

8

belief that he had been promised leniency (or even if he had been promised some form of leniency), this circumstance alone would not make Kilgore's confession involuntary. . .Again, the test is whether Kilgore's " 'will [was] overborne and his capacity for self-determination critically impaired.' " . . . We conclude that it was not.

There exists no evidence of physical or emotional coercion, direct or indirect. The record, however, presents substantial evidence that Kilgore confessed in order to retain use of his personal vehicle and not spend the night in jail.

In sum, we do not believe Kilgore's " 'will [was] overborne and his capacity for self-determination critically impaired.' " . . .The inspectors read Kilgore his rights; Kilgore waived his rights; and Kilgore voluntarily confessed. The government has thus established that Kilgore's confession satisfied his requirements of the fifth amendment.

United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995).

Given the above law, the undersigned concludes that the Defendant's statements were voluntarily made and should not be suppressed. As to the Defendant's statement to Officer Orton that he did not know anything about the gun, the statement was made after the Defendant was fully advised of his rights, stated he understood his rights, and waived his rights by talking to Orton. No threats or promises were made to the Defendant to obtain the statement, and he appeared to be lucid and sober to Orton. As to the oral admission about the gun and the drugs that the Defendant made to Agent Ramos, this came after the Defendant was again fully advised of his rights in writing, and waived his rights in writing. The admission was made within five minutes of the beginning of the interview, and at that point, no promises of any type had been made to the Defendant, nor were there any threats ever made to the Defendant. As to the written statement, this came after the Defendant was twice advised of his rights, twice waived his rights, and had already made an oral admission containing the exact same details as the written admission. As to the possibility of making a written statement if he were allowed to go home that evening, this was suggested by the Defendant and not by the agent after the agent asked him if he would reduce the statement to writing. Given the above

facts, particularly the multiple advice of rights and the lack of any threats, the undersigned concludes that any "promises" made to the Defendant that he could go home that evening did not overbear the Defendant's will just as similar statements did not overbear the will of the Defendant in United States v. Kilgore, supra. Therefore, the undersigned concludes that the Defendant's statements were voluntarily made after the Defendant was fully advised of his rights and waived those rights.

Under these circumstances, the undersigned concludes that the Defendant was fully and completely advised of his rights, stated he understood his rights, and knowingly waived those rights. The undersigned further concludes that based on the totality of the circumstances of the Defendant's interrogation, the Defendant's statements were voluntarily made and his free will was not overborne by anything that took place in the interview. Miranda v. Arizona, 384 U.S. 436 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1985). Therefore, the custodial statements of the Defendant should not be suppressed.

**Conclusion**

Therefore, the Defendant's motion to suppress evidence and statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. #15--dated 9/4/07] be **denied**.

Further, the parties are advised that they have until December 31, 2007, in which to file written objections to this recommendation and determination. Failure to timely file objections may

result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Finally, the trial of this matter is set on **February 4, 2008, at 9 a.m.** before the Honorable Rodney W. Sippel, United States District Judge, Courtroom 10-South.


<u>        /s/ Terry I. Adelman        </u>
UNITED STATES MAGISTRATE JUDGE

Dated this  <u>18th</u>  day of December, 2007.